IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| RONNIE BARBER #1350073 | § | |
| v. | § | CIVIL ACTION NO. 6:09cv238 |
| NATHANIEL QUARTERMAN, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

The Plaintiff Ronnie Barber, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding, pursuant to 28 U.S.C. §636(c). As Defendants, Barber named the former TDCJ-CID Director, Nathaniel Quarterman; Wardens Chuck Biscoe and Robert Herrera of the Beto Unit; Major Michael Owens; Captain Bruce Foreman; Lt. James Green; Sgt. Floyd Robertson; Lt. Joe Childress; and Officer Lanny Brown.

In his complaint and at an evidentiary hearing, Barber said that on October 28, 2007, he was 61 years old and assigned to the unit trusty camp. He said that he was having trouble with other inmates, and so he went to Officer Brown at 5 p.m. on that day and said that there was trouble. Sgt. Robertson took him to the office. Barber notes that a number of inmates saw this. At the office, Barber told Robertson that because of his age, he took the threats from the younger inmates very seriously and that he was afraid of being ganged up on and beaten. He told Robertson that "demands had been made with a deadline," but states that Robertson did not remove him from the situation.

Instead, Barber says, Robertson kept him in the office. An "unauthorized hostile inmate" named Griffin came into the office during the interview, and Robertson allowed Griffin to stand by

1

and read the life endangerment statement which Barber had just given. This statement named Griffin as well as other inmates in relation to verbal and physical assaults.

While Barber was in Robertson's office, he said, another inmate named Desaider came up to the window and began making statements to Barber such as "come outside," "don't do this," "let's talk about this," "you can't get away," "I'll get you for this," and "you're dead." Barber says that Robertson witnessed this but did nothing.

Shortly after Desaider left, Barber says, Officer Brown came back, and Robertson told him about Desaider's threats. Robertson told Brown to stay with Barber in the office in case Desaider came back. The officers then took him to the parking lot, which Barber says is "the message pipeline to the main building." Barber says that a laundry truck was there with several inmates from each dorm, and so "the hit on Barber would be all over the unit." While in the parking lot, Brown told Barber that if he had known of the magnitude of Barber's danger, Brown would have gone with him immediately; however, he says, Brown still failed to report the situation to higher authorities.

A few hours later, around 7:00 p.m., Barber says that Robertson took him to the main building, where he reported to Foreman and Green. Barber says that Robertson gave an accurate description of what happened, except that Robertson failed to say that he and Brown had not done anything to protect Barber. Foreman turned to Barber and asked "can't you fight?" Barber replied that he could fight, but not against gangs and not at his age. Robertson told Foreman that Barber had been gambling on football games, and Foreman said that Barber's problems were his own doing because Barber had been gambling and could not pay his debts. Foreman took Robertson and Green into the security office to type up his reports.

When they came out, Barber says, Foreman told him "I can't help you now, you have to help yourself." He says that "gambling became the main issue" and that Foreman chose to believe that the incident was caused by gambling and by Barber's wanting to escape paying a debt.

On December 31, 2007, Barber says that he went to a unit reclassification proceeding, presided over by Owens. There, he was told that his request for a unit transfer was denied because

of a lack of evidence to support the need for a unit transfer. Owens read Robertson's report and said that Robertson had denied seeing or hearing anything to substantiate Barber's allegations. Barber said that Robertson had falsified the report.

That same day, Barber filed a grievance against Robertson for falsifying the report, and against Brown for doing nothing to correct it. However, Warden Biscoe did nothing about the grievance and denied his request for a unit transfer. During this period of time, Barber received several disciplinary cases when he refused a move to general population, where he says that he would have had to "fight off my enemies." He told the officers that he was not "being contrary," but was trying to save his life.

A couple of weeks later, on January 17, 2008, Barber says that he sent an I-60 inmate request form to Owens asking for assignment to a single cell. Owens ordered that Barber be placed in a "special cell restriction" and that he be put in a single cell; however, Barber says that he continued to receive disciplinary cases for refusing to move to population. He says that he was taken to Childress' office several times and made statements why he was refusing a move to population, in which he explained that he had enemies on the Beto Unit. However, Childress failed to take any action to protect him.

On January 23, 2008, an inmate named Hendrick, who had just come from the Skyview psychiatric unit, was placed in Barber's cell. He says that Hendrick was friends with many members of the Aryan Nations prison gang, which he said was a "family" with the people who were causing him problems. When Hendrick was moved into his cell, Barber sent an inmate request form to Owens and to Biscoe, but the requests were ignored. He then filed a grievance, which received the response that Barber was appropriately housed.

On April 30, 2008, Barber says that he received another disciplinary case for refusing to move to general population. A few days after the disciplinary hearing, Barber was taken to a reclassification hearing before Warden Herrera. Barber explained that the problems had begun when he did some art work for Desaider, who paid for part of it but then wanted his money back a couple

3

of weeks later. He said that Desaider had threatened his life, but Herrera said that he did not have anything for Barber because Barber had broken policy by tattooing, trafficking and trading, and gambling. Barber asked if Herrera was saying that it was all right if he got stabbed to death, and Herrera responded that Barber had brought it on himself. Seven weeks later, Barber says that he was assaulted by Hendrick, who stabbed and cut him repeatedly.

Barber conceded that Hendrick had been in his cell for months before assaulting him, but noted that Hendrick had made a number of comments about cutting someone so he could go to segregation. Barber said that he never thought that he would be the one that Hendrick cut, and stated that he was "surprised" when Hendrick assaulted him.

Barber testified that he sued Nathaniel Quarterman because Quarterman was in charge of the prison. He stated that Warden Biscoe, the senior warden, should be responsible for what goes on at the unit. Barber also said that Biscoe set policy to run the unit, and that unit policies do not always follow TDCJ policies. In this case, Barber said, the policies were ignored because he gambled.

Barber said that Warden Herrera was sued partly because of his position of authority, and partly because on the day that Barber went to the unit classification committee, Herrera told him that his problems were his own fault because he had been gambling. Barber said that Major Owens had told him that he would be single-celled, but a few days later, Hendrick was moved in.

Next, Barber said that when Robertson delivered him to the main unit, they met with Captain Foreman and Lt. Green. He said that Robertson was the main reason that everything happened, and that Robertson gave Foreman a verbal report. Foreman then told Barber that "I can't help you, you have to help yourself." He said that Robertson lied in his report to Foreman and that Robertson should have said that he knew about Desaider's threat. Barber said that Officer Brown referred him to Robertson and that Brown's "knowledge of the threats" should make him liable as well.

Barber said that the reports had been falsified because they did not say anything about his being threatened or why he wanted to move. He said that Lt. Childress kept asking for evidence, and Barber kept trying to explain that he was locked up. He says that other inmates told Childress what

4

was going on but Childress ignored it. At the unit classification committee, Barber says that he was told that he had "no new evidence" even though he had been presenting evidence for three months.

Nurse Joanie Edmonds, a correctional nurse also present at the evidentiary hearing in this case, testified that as a result of the assault, Barber suffered two lacerations, four and five inches long. These were cleansed and derma-bonded. The next day, Barber was seen by a physician, and the dermabond had come off, so the injuries were stitched. Ginger Lively, a representative of the TDCJ Regional Grievance office, testified at the evidentiary hearing that Barber had exhausted his administrative remedies; she noted that the unit had undertaken 10 life endangerment investigations in eight months.

The Court has received and examined copies of TDCJ records offered into evidence at the hearing. These records show that on May 22, 2008, an offender protection investigation (OPI) was begun. Barber alleged that his life was in danger due to owing a debt to several inmates in the Trusty Camp. He identified inmates Christopher Desaider, Sam Griffin, and Anthony Brown. The report noted that repeated investigations had been done, and that the only new evidence presented was written statements from inmates Charles Gardiner, Robert Wilson, Jerome Hendrick, and Vincent Cauley, each of whom said that they had heard unknown inmates threaten Barber. Barber gave a written statements consistent with statements he had previously made. A photo lineup of 72 black inmates and 19 white inmates was shown to Barber, but he failed to identify anyone whom he said had threatened him on U Wing. The investigation concluded that there was insufficient evidence to corroborate the allegations.

On March 22, 2008, Barber was supposed to move from Special Penalty Cell Restriction to another cell, but he alleged that his life was in danger and so he refused to move. He wrote a statement asserting that his life is in danger because he owed inmates money as a result of betting on sporting events. An investigation was conducted by Lt. Facio, who recommended a unit transfer, but the State Classification Committee denied the transfer for lack of evidence. The March

investigation concluded that Barber had no new evidence and that his claims were "repetitive or frivolous."

During the course of that investigation, Barber named Desaider, Griffin, Brown, and an inmate named Julio Hernandez. The investigation summary notes that these claims had been investigated on several previous occasions with no evidence found. Barber said that he was being threatened because he owed gambling debts. He stated that Sgt. Robertson and Officer Brown witnessed the incident, but both officers denied seeing or hearing anyone threaten Barber. Barber also submitted statements from Hendrick, Cauley, and Gardiner, saying that unidentified inmates threaten Barber. The investigation concluded that insufficient evidence existed and that Barber's allegations could not be substantiated.

Other investigations were concluded on October 28, 2007; December 31, 2007; January 14, 2008; and January 22, 2008. In the October 28 investigation, Barber said that he was "guilty of owing money" and that Desaider was threatening him. Sgt. Robertson, who wrote the investigation summary, concluded that if Barber was moved back to the camp, he could be assaulted.

In the December 31 investigation, Barber again alleged that his life was in danger because of money which he owed. In the report of this investigation, Lt. Childress states as follows:

> On 12-31-2007 Offender Barber, Ronnie was scheduled to move from F-125 to J-327. At the time Offender Barber was ordered to move, he alleged that his life was in danger in General Population. Offender Barber alleges that his life is in danger due to owing several offenders at the Trusty Camp money from gambling. Offender Barber alleges that Officer Brown and Sgt. Robertson have knowledge of the threats made toward him. These allegations were investigated by Lt. Facio on 10-31-2007, with the UCC recommending transfer. On 12-28-2007 the SCC denied the transfer due to lack of evidence. Offender Barber states that he has no new or additional evidence to support his allegations.

Lt. Childress noted that a transfer had been denied on December 28, just three days earlier, and that Barber had offered no new evidence. The January 14 and January 22 investigations reached the same conclusion.

The report of the assault on Barber says that on June 25, 2008, Barber notified Officer Dry that he had been assaulted by his cellmate, Jerome Hendrick. Dry called for a supervisor and when

Sgt. Agapiou arrived, the cell was opened and Barber was taken to the infirmary for treatment. There, Nurse Dotson noted one four-inch and one five-inch laceration to Barber's chest and called a provider, who advised her to use Dermabond to close the wounds. Barber was then placed in a transient cell pending completion of an offender protection investigation.

Hendrick was then taken to the infirmary, where a physical revealed no injuries. He was placed in pre-hearing detention and charged with assaulting an offender with a weapon. Lt. Childress interviewed Hendrick, who said that he had assaulted Barber because "I just don't like him." A search of the cell found no weapons. Barber told the investigator that Hendrick had returned from the shower and said that he needed to use the restroom, so he, Barber, got up from the desk and went to the front of the cell, Hendrick then came up behind him and cut him on the left chest; Barber said that he thought that Hendrick had flushed the razor down the toilet.

On June 27, two days later, Barber was seen by the Unit Classification Committee for an offender protection investigation. Based on the information presented, including the fact that he had been assaulted with a weapon, the committee recommended that Barber be transferred. This was done on June 30, when Barber was transferred to the Darrington Unit.

Legal Standards and Analysis

Barber's primary claim is that the Defendants were deliberately indifferent to his safety. Prison officials have a duty not to be deliberately indifferent to the safety of their inmates. Johnston v. Lucas, 786 F.2d 1254, 1260 (5th Cir. 1986); Jacquez v. Procunier, 801 F.2d 789, 792 (5th Cir. 1986). A showing of mere negligent indifference is not enough for a constitutional claim. Davidson v. Cannon, 474 U.S. 344 (1986).

In Davidson, the Supreme Court faced the issue of what constitutes deliberate indifference to an inmate's safety. There, an inmate named Davidson was threatened by another inmate, McMillian. Davidson sent a note to the Assistant Superintendent of the prison, Cannon. Cannon passed the note to a guard named James. James, however, left the note on his desk and later forgot about it. McMillian later assaulted Davidson, causing serious injuries.

The Supreme Court acknowledged that the Defendants' lack of due care resulted in serious injury, but held that the lack of due care alone did not approach the sort of abusive governmental conduct that the Due Process Clause was designed to prevent. The Court emphasized that negligence alone was insufficient to trigger the protections of the Fourteenth Amendment. Davidson, 474 U.S. at 347-48.

The Supreme Court has specifically addressed the issue of deliberate indifference to an inmate's safety in prison. The Court explained that

> [A] prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. ...
> But an official's failure to alleviate a significant risk which he should have perceived, but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Farmer v. Brennan, 511 U.S. 825, 837-38, 114 S.Ct. 1970, 1979 (1994); *see* Reeves v. Collins, 27 F.3d 174, 176 (5th Cir. 1994).

In this case, although Barber complains that the prison officials were deliberately indifferent to his safety, the records show that Barber's allegations that he was in danger were routinely investigated by these officials. At one point, in October of 2007, Sgt. Robertson concluded that Barber should be transferred to another unit, and this recommendation was adopted by the Unit Classification Committee, but the State Classification Committee in Huntsville denied the request on the ground that there was insufficient evidence to justify a transfer. The prison officials at the Beto Unit were bound by this decision from the State committee, and so Barber could not be transferred.

In later investigations, the prison officials observed that Barber did not present any new evidence beyond that which the State committee had already found to be insufficient. Although he had additional statements from other inmates, these statements invariably said that it was "unknown persons" who were threatening Barber. In an attempt to gain more specificity, the prison officials

8

set up a photographic lineup of almost 100 inmates, but Barber was unable to identify any of them as the persons who had been threatening him. Far from being deliberately indifferent to his safety, the prison officials went to significant lengths in an attempt to investigate Barber's complaints. His contention that these officials were "deliberately indifferent" is without merit.

Although Barber also complains about the way in which some of these investigations were conducted, including taking him to the parking lot or to Robertson's office in full view of other inmates, these contentions fail to show deliberate indifference on the part of any of the Defendants. Even if the conduct of the investigation could have been handled in a better way, Barber has not shown that the Defendants' actions in this regard rise to the level of deliberate indifference rather than mere carelessness.

Next, Barber complains that Robertson and Brown "falsified reports" by saying that they did not know anything about threats when in fact they did. The Fifth Circuit has stated that there is no constitutional right to a completely accurate police report. Smith v. Patri, 99 Fed.Appx. 497, 2004 WL 180403 (5th Cir., January 29, 2004). Other courts have likewise held that the mere existence of a falsified police report does not in and of itself violate any federal rights. Nowell v. Acadian Ambulance Service, 147 F.Supp. 2d 495, 505 (W.D.La. 2001), *citing* Landrigan v. City of Warwick, 628 F.2d 736, 745 (1st Cir. 1980). For the same reason, there is no constitutional right to a completely accurate report by prison officials. Barber's claim on this point is without merit.

The first Defendant named in the lawsuit is Nathaniel Quarterman, then the Director of the Correctional Institutions Division of TDCJ-CID. Barber says that Quarterman is "legally responsible" for the security of the institutional units, including the Beto Unit, and is legally responsible for the TDCJ Orientation Handbook and the policies and procedures manual, including the Safe Prisons Program.

The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A

9

supervisor may be held liable if there is personal involvement in a constitutional deprivation, a causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Barber has not shown that Quarterman was personally involved in a constitutional deprivation, that wrongful conduct by Quarterman was causally connected to a constitutional deprivation, or that Quarterman implemented a constitutionally deficient policy which was the moving force behind a constitutional deprivation. Rather, the evidence shows that a number of offender protection investigations were carried out, in accordance with the policies of TDCJ. The fact that these investigations did not arrive at the conclusions which Barber thought appropriate does not show that a constitutional violation took place. *See* Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005) (inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so). Barber's claim against Quarterman is without merit.

The second Defendant whom Barber names is Warden Biscoe, whom Barber says is ultimately responsible for the operation of the unit and for the actions and conduct of the employees, and for the implementation of policies at the unit. This is a claim of liability under the doctrine of *respondeat superior*. Barber has not shown that Warden Biscoe was personally involved in a constitutional deprivation, that wrongful conduct by the warden was causally connected to a constitutional deprivation, or that Warden Biscoe implemented any constitutionally deficient policies which were the moving force behind a constitutional deprivation. As noted above, numerous investigations were carried out into Barber's claims that he was in danger, and a recommendation was made that Barber be transferred, which recommendation was rejected due to lack of evidence. Barber has not shown any basis for liability on the part of Warden Biscoe and his claim on this point is without merit.

Barber says that in April of 2008, he went before Warden Herrera in a unit classification committee hearing and explained the problem to him, and Herrera said that Barber had brought the problems on himself, stating that he did not care if Barber got assaulted. However, Barber has not shown any link between this meeting and the assault which actually took place. As noted above, Barber professed surprise that he was assaulted by his own cellmate, Hendrick, an inmate who had given statements for Barber in the past; he testified at the evidentiary hearing that "he never thought that he would be the one that Hendrick cut" and that he was surprised when Hendrick assaulted him.

Inasmuch as Barber did not know that Hendrick would assault him, it stands to reason that neither Herrera nor any of the other prison officials could have known that Hendrick would assault him. Barber conceded that the assault took place a full seven weeks after his meeting with Herrera. The courts have made clear that even where advance warning is given to prison officials about a specific threat from a specific inmate, the failure to act in response is not a constitutional violation unless the claim amounts to deliberate indifference rather than a mere lack of due care. Davidson, 474 U.S. at 346.

By contrast, in Stokes v. Delcambre, 710 F.2d 1120, 1127 (5th Cir. 1983), some men in a truck threw a beer bottle at the feet of two men walking on the side of the highway. The walkers enlisted the aid of a deputy police officer, who arrested the occupants of the truck and placed in them in the Vermillion Parish Jail. Two of the men, Stokes and Shows, were beaten and sexually assaulted by fellow prisoners. The evidence at trial showed that one of the jailers, deputy Alton Romero, had asked Shows "have they [sexually assaulted] you yet?" When Shows said no, Romero replied "don't worry about it, they will." This testimony, plus evidence that the Sheriff was flouting a court order to separate prisoners by classification, that sufficient space existed to separate the truck occupants from the jail inmates who were facing felony charges including aggravated rape and aggravated robbery, and that the jail staff had welded the glass viewing panel shut with a metal plate so they could not see into the cell, was sufficient for the Fifth Circuit to uphold a jury finding of deliberate indifference.

Barber has shown nothing resembling the circumstances in Stokes.  Although he says that Warden Herrera told him that he did not care if Barber was assaulted, he has not shown that the actual harm that came to him – the assault by Hendrick – was foreseeable, particularly in light of the fact that Barber himself acknowledged that he was surprised that Hendrick assaulted him.  Because the danger of an assault by Hendrick was not foreseeable, Barber has not shown that Warden Herrera was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed of such an assault, and that Herrera also drew this inference.[1]  In addition, Barber's meeting with Herrera took place in April of 2008, after a number of life endangerment investigations had been conducted and had been found to have insufficient evidence.  While Herrera'a remarks, as cited by Barber, may have been improper, the actions of the prison officials in repeatedly investigating Barber's complaints belie his claims of deliberate indifference.  His claim against Warden Herrera is without merit.

Similarly, Barber says that Captain Foreman asked him "can't you fight" and told him that his problems were his own doing because he had gambled.  He said that Foreman also told him "I can't help you, you have to help yourself."  As with Warden Herrera, Barber has not shown that Foreman should have foreseen the assault from Hendrick.  Nor has he shown that Foreman was aware of facts from which the inference could be drawn that a substantial risk of harm existed, nor that Foreman drew this inference.

Furthermore, although Barber says that Foreman told him that he had to help himself, the record shows that an offender protection investigation was begun on the very day that Barber talked to Foreman, which was October 28, 2007.  Barber has not shown that Foreman was deliberately indifferent to his safety, despite his intemperate words, and his claim against Foreman is without merit.

---

[1]Barber was on special cell restriction at the time and thus isolated from the general population, including the persons whom he said were threatening him.

Next, Barber complains that Major Owen had ordered that he be single-celled, but that just a few days later, he was given a cellmate, Hendrick. He said that Hendrick had been at the Skyview Unit and often talked about cutting someone, although Barber acknowledged that he did not think that he would be the person cut by Hendrick. The offender protection investigations also show that Hendrick gave statements on behalf of Barber, recounting threats from unknown inmates which Hendrick had heard.

There is no constitutional right to a single cell. *See, e.g.*, Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (no violation of the Constitution in the practice of double-celling inmates); Parker v. Currie, slip op. no. 08-41023, 2010 WL 10924 (5th Cir., January 4, 2010), *citing* Neals v. Norwood. 59 F.3d 530, 533 (5th Cir. 1995) (inmate in Parker wanted a single cell but was assigned to general population; no constitutional liberty interest was infringed). Even assuming that Major Owen ordered that Barber be placed in a single cell and then had Hendrick put in there as well, Barber has failed to show a constitutional violation in this regard and his claim on this point is without merit.

Nor has Barber shown that Major Owens was deliberately indifferent to his safety by assigning Hendrick as his cellmate. As noted above, the assault by Hendrick on Barber was not reasonably foreseeable, even by Barber himself. Barber was in special cell restriction and was thus separated from the general population, as shown by the large number of disciplinary cases which he received for refusing to move to the general population. Hence, to the extent that Barber complained that he had enemies in the general population, the prison officials could reasonably assume that he was isolated from them. Barber has failed to show that Major Owens was deliberately indifferent to his safety and his claim against Owens is without merit.

Barber stated that Sgt. Robertson was "the main reason it all happened." He stated that Robertson gave Foreman a verbal report which was accurate, but that in his written report, Robertson denied hearing the threats which Desaider had directed against him. He noted that Robertson had taken him to the office in full view of the other inmates, that another inmate had come into the office

and read the reports, and that Desaider had threatened him from outside the window, which threats Robertson later denied hearing.

The records show that Robertson was the investigating officer in the October 28 investigation, which was the investigation that recommended a unit transfer. Robertson wrote in the report that "it is this interviewer's opinion that if Offender Barber is moved back to the Trusty Camp he will be severely physically assaulted seeing as how he is indigent and cannot repay the debts that he owes." Thus, the record shows that Robertson believed Barber and took his side in the investigation. As stated by Lt. Childress, the October 28 investigation resulted in a unit recommendation that Barber receive a unit transfer; the fact that the unit's recommendation was rejected by the State Classification Committee does not show that Robertson, the investigating officer, was deliberately indifferent to Barber's safety.

As discussed above, Barber's contention that Robertson "falsified the report" by saying that he knew nothing about the threats, when in fact he did, does not set out a constitutional violation. Nor does the fact that Robertson may have conducted his investigation in a way which Barber thought improper or inappropriate amount to a constitutional claim. Barber's claim against Robertson is without merit.

Barber says that Officer Brown referred him to Robertson, and that Brown knew about the threats but did nothing. He stated that Brown was liable even though his involvement was eight months prior to the actual assault, and complains that Brown falsified the report by saying that he did not know about the threats when he did. As Barber concedes, Brown took him to a supervisor upon being told that Barber was in danger. Barber has not shown that Brown was deliberately indifferent to his safety or that a constitutional violation existed in Brown's alleged falsification of the reports, and his claim against Brown is without merit.

Barber says that Lt. Green "witnessed a fraud being committed" and did nothing about it, nor did he report it to the prison authorities. He says that Green entered into a conspiracy with Foreman and Robertson, directed at depriving Barber of his constitutional rights. However, the Fifth Circuit

has held that to recover on a claim of a conspiracy, there must be an actual deprivation of a constitutional right; a mere conspiracy to deprive is insufficient. Villanueva v. McInnis, 723 F.2d 414, 418 (5th Cir. 1984). In this case, Barber has not shown the deprivation of a constitutional right, because he has not shown that any of the named Defendants was deliberately indifferent to his safety. The multiple life endangerment investigations belie any conspiracy to violate Barber's rights. Barber's claim against Green is without merit.

The last Defendant named in the lawsuit is Lt. Childress. Barber says that he met with Childress several times and gave him statements of why he was refusing to move to general population, and that he repeatedly named the inmates who had been threatening him. He says that he also told Childress about the falsification of the documents, and that Childress' knowledge of these facts renders him liable. Furthermore, Barber alleges that Childress failed to interview the inmates who gave statements on Barber's behalf, although he does not say how he knows this to be the case.

The record shows that Childress conducted several of the life endangerment investigations, including the ones on May 28, 2008; April 30, 2008; January 14, 2008; and December 31, 2007. Childress put together the line-up and reviewed the statements from the other inmates which Barber submitted as evidence. The fact that these investigations did not result in the action which Barber wanted taken does not show that Childress was deliberately indifferent to Barber's safety. His claim against Childress is without merit.

In his complaint, Barber asserts that the actions of the Defendants violated TDCJ regulations, citing the prison rules and regulations as well as what he called the "PD-22" manual, the rules of conduct and procedure for TDCJ employees. The Fifth Circuit has held that a violation of prison rules alone is not sufficient to rise to the standards of a constitutional claim. Myers v. Klevenhagen, 97 F.3d 91, 94 (5th Cir. 1996); Hernandez v. Estelle, 788 F.2d 1154, 1158 (5th Cir. 1986). Because Barber has not shown a constitutional violation, his claims of violations of prison rules and regulations are without merit.

Finally, Barber cites alleged violations of state law, apparently seeking to invoke the supplemental jurisdiction of the Court. The doctrine of supplemental jurisdiction is codified in 28 U.S.C. §1367, for all civil actions filed on or after December 1, 1990. See Public Law 101-650, Section 310(c); Whalen v. Carter, 954 F.2d 1087, 1097 n.10 (5th Cir. 1992).

28 U.S.C. §1367(a) reads as follows:

> Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims in the action within such original jurisdiction that they form part of the case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

Subsection (b) refers to actions filed under diversity jurisdiction and thus is not applicable in this case. Subsection (c) reads as follows:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
>
> (1) The claim raises a novel or complex issue of State law;
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction;
>
> (3) the district court has dismissed all claims over which it has original jurisdiction; or
>
> (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction.

Here, the Court acquired original jurisdiction based on Barber's claim of a violation of federal law under 42 U.S.C. §1983 and the Eighth Amendment to the U.S. Constitution. *See* Baker v. McCollan, 443 U.S. 137 (1979). However, Barber has failed to show a constitutional violation, and so the claims over which this Court possessed original jurisdiction are without merit. This Court therefore will decline to exercise supplemental jurisdiction over Barber's state law claims, deferring instead to the laws and judicial processes of the State of Texas. 28 U.S.C. §1367(c)(3). Because the Court declines supplemental jurisdiction over the state law claims, the statute of limitations on such claims is tolled from the date the lawsuit was originally filed until thirty days after the final judgment dismissing the action is entered on the docket. 28 U.S.C. §1367(d). *See* Slaughter v. Allstate

Insurance Co., 803 F.2d 857 (5th Cir. 1986) (supplemental jurisdiction should not ordinarily be exercised where there is no federal claim).

Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke v. Williams, 490 at 327, *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Barber's federal law claims lack any arguable basis in law and fail to state a claim upon which relief may be granted, because he has not made a showing that any of the named defendants were deliberately indifferent to his safety as that term has been defined by the Supreme Court and the Fifth Circuit. Consequently, his claims may be dismissed under Section 1915A. *See generally* Thompson v. Patteson, 985 F.2d 202 (5th Cir. 1993). Because these federal law claims lack merit, the Court should decline supplemental jurisdiction over Barber's state law claims. It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED as frivolous and for failure to state a claim upon which relief may be granted. Such dismissal shall be with prejudice as to its refiling *in forma pauperis* in federal court, but without prejudice as to any relief under state tort law which Barber may seek in the courts of the State of Texas. 28 U.S.C. §1915A. It is further

ORDERED that the statute of limitations on Barber's state law claims be and hereby is TOLLED from the date that the lawsuit was originally filed until 30 days after the date of entry of final judgment in the case. 28 U.S.C. §1367(d). It is further

ORDERED that any and all motions which may be pending in this cause are hereby DENIED. Finally, it is

ORDERED that the Clerk shall provide a copy of this opinion to the Administrator of the Strikes List for the Eastern District of Texas.

So **ORDERED** and **SIGNED** this 5 day of **April, 2010.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE